1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

13

CITIZENS OF THE EBEY'S
RESERVE FOR A HEALTHY, SAFE
& PEACEFUL ENVIRONMENT,

Plaintiff,

v.

U.S. DEPARTMENT OF THE
NAVY, et al.,

Defendants.

C13-1232 TSZ

ORDER

14

15  Since 1943, the U.S. Department of the Navy ("Navy") has used Outlying Landing

16  Field ("OLF") Coupeville to train its pilots and simulate the conditions and procedures of

17  landing on an aircraft carrier while at sea.  In 2005, the Navy analyzed the projected

18  impact of replacing the aging EA-6B Prowler with the EA-18G Growler as its primary

19  electronic attack aircraft.  The Navy's 2005 analysis and Environmental Assessment

20  ("EA") concluded that the transition from the Prowler to the Growler would have "no

21  significant impact" on the environment.

22

23

ORDER - 1

1   In 2013, plaintiff Citizens of the Ebey's Reserve for a Healthy, Safe & Peaceful

2   Environment ("COER"), a non-profit organization comprised of residents and property-

3   owners surrounding the Navy's Coupeville training facility, filed this action under the

4   National Environmental Policy Act.  Plaintiff's suit seeks to compel the Navy to conduct

5   an Environmental Impact Statement ("EIS") regarding its activities at OLF Coupeville

6   and an injunction barring the Navy from further operations at this facility until the EIS is

7   complete.  The Navy has now agreed to conduct a new environmental review of its flight

8   operations at OLF Coupeville.  Thus, the only question presented in the pending motion

9   is whether the ongoing activity is "significantly and qualitatively different or more

10   severe" than predicted in the 2005 EA, so as to require an injunction prohibiting further

11   flight operations at OLF Coupeville until the new study is completed.

12   For the reasons stated in this Order, the Court concludes that plaintiff has not

13   established a likelihood of success on the merits, has not sufficiently demonstrated that its

14   members will suffer irreparable harm absent an injunction, and has not shown that the

15   balance of equities or the public interest weigh in its favor.  Accordingly, plaintiff's

16   motion for a preliminary injunction, docket no. 21, is DENIED.

17   **BACKGROUND**

18   Plaintiff is a non-profit organization made up of individuals that own property or

19   reside near the Navy's OLF Coupeville base.  Compl. (docket no. 1) ¶ 9.  Plaintiff has

20   sued defendants under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–

21   706, alleging violations of the National Environmental Policy Act of 1969 ("NEPA"), 42

22   U.S.C. § 4321, and the Navy's regulations implementing NEPA, 32 C.F.R. § 775.6.

23

ORDER - 2

Compl. (docket no. 1) ¶ 2.  Plaintiff seeks a declaratory judgment that the Navy has failed

to comply with NEPA regarding its operation of the EA-18G Growler aircraft at OLF

Coupeville and an order requiring the Navy to comply with its NEPA obligations.

*Id.* ¶ 1, 3–4.  Plaintiff also seeks equitable relief barring further activities at OLF

Coupeville until the Navy has come into full compliance with NEPA.  *See id.* ¶ 5.

## 1.   NAS WHIDBEY ISLAND AND OLF COUPEVILLE

OLF Coupeville is located on Whidbey Island in Washington State and is part of

the Navy's Naval Air Station ("NAS") Whidbey Island.  *See* Compl. (docket no. 1) ¶ 22.[1]

NAS Whidbey Island is the home-base to the Navy's airborne electronic attack aircraft

units.  Shoemaker Decl. (docket no. 48) ¶ 6.  The mission of the Navy's electronic attack

aircraft is "to neutralize, suppress, and destroy enemy air defense and communication

systems from carrier or land based operations."  *Id.* ¶ 5.  The Navy's electronic attack

aircraft units are an active component of our nation's military and are currently flying

EA-18G aircraft in support of operation Inherent Resolve against the Islamic State in the

Middle East.  *See* Hewlett Decl. (docket no. 46) ¶ 5.

OLF Coupeville was built in 1943 for the purpose of conducting practice landing

procedures.  The Navy used OLF Coupeville for this purpose until 1963, when it

determined that the Coupeville facility was no longer needed.  In 1967, however, OLF

---

[1] NAS Whidbey Island is comprised of four airfields:  Ault Field, which is the primary operating facility, OLF Coupeville, which is located 10 miles south of Ault Field, and two other facilities.  U.S. DEP'T OF THE NAVY, FINAL: ENVIRONMENTAL ASSESSMENT FOR REPLACEMENT OF EA-6B WITH EA-18G AIRCRAFT AT NAVAL AIR STATION WHIDBEY ISLAND, WASHINGTON 5 (2005) [hereinafter "2005 EA"].

Coupeville was reactivated in response to the increased demand for training due to the Vietnam War.  Since 1967, OLF Coupeville has been primarily used for Field Carrier Landing Practice ("FCLP").  2005 EA at 6.  FCLP is a training exercise meant to simulate the conditions and procedures of landing on an aircraft carrier while it is at sea. In prior litigation involving OLF Coupeville, owners of forty-six parcels surrounding the NAS Whidbey Island alleged inverse condemnation as a result of frequent and noisy aircraft operations.  The Court explained the FCLP operations at OLF Coupeville as follows:

> The exercise involves groups of up to five aircraft flying in patterns to practice touch-and-go landings.  Each aircraft in turn approaches the runway and touches down, but then takes off again without coming to a stop.  The aircraft then loops around and prepares for another landing. Each aircraft makes multiple touch-and-go landings before stopping to refuel.  Aircraft in these exercises at OLF Coupeville fly at low altitudes over the private property surrounding the landing strip.

*Argent v. United States*, 124 F.3d 1277, 1278 (Fed. Cir. 1997).  Navy pilots must complete FCLP before they can attempt to land on an actual aircraft carrier.  Shoemaker Decl. (docket no. 48) ¶ 14.  To satisfy this requirement, each pilot must "complete between 120 and 140 FCLP approaches demonstrating safe and predictable execution of proper procedures[.]"  *Id*.

According to the Navy, "[t]o be most effective, FCLP training must replicate, as nearly as practicable, the conditions encountered during carrier landings."  *Id*.  OLF Coupeville is ideal for training pilots how to execute the procedure of how to land on an aircraft carrier because it "is situated near sea level" and pilots are able to train at

ORDER - 4

altitudes and under conditions that will produce "aircraft performance characteristics [that] are similar to at-sea conditions." *Id*. ¶ 16.

The Navy has designated two flight paths for FCLP exercises at OLF Coupeville. Flight path 32 is for aircraft arriving from the south and departing to the north.  Flight path 14 is for aircraft arriving from the north and departing to the south.  Aircraft using flight path 32 pass directly over the property owners of Admiral's Cove on their approach.

## 2.    THE 2005 ENVIRONMENTAL ASSESSMENT

For over 30 years, the Navy's electronic attack aircraft was the EA-6B Prowler. *See* 2005 EA at 1.  In 2005, the Navy announced that the EA-6B Prowler would be replaced by the EA-18G Growler as the Navy's primary electronic attack aircraft.  *See id*. Replacement of the EA-6B Prowler was projected to begin in 2008 and be completed by 2013.  *Id*. at 2.  As a result of this transition, it was estimated that 57 EA-18G Growlers would replace 72 EA-6B Prowlers; a decrease of 15 aircraft.  *Id*.

In 2005, the Navy conducted an environmental assessment regarding this transition.  The Navy projected that there

> [W]ill be no change in the training syllabus that would cause changes to the types of flight operations flown by the EA-6B (arrivals, departures, pattern operations), the locations of the flight operations (flight tracks over land or water), or the current ratio of daytime and nighttime flight operations at Ault Field or OLF Coupeville.

*Id*.  The Navy also anticipated that the number of FCLP operations at OLF Coupeville after the transition to the EA-18G would be fewer than the 6,120 operations that had taken place in 2003.  *Id*. at 10 & 11, Table 1-3.

ORDER - 5

1    The 2005 EA also evaluated the potential changes in environmental noise that

2  would result from the introduction of the EA-18G at NAS Whidbey Island.  *Id.* at 35–41.

3  This assessment was based on a 2004 study performed by Wyle Laboratories, Inc.[2]  *See*

4  2005 EA at 36.  The Wyle Report used "noise measurements of controlled flyovers at

5  prescribed power, speed, and drag configurations[,]" combined with information about

6  the airfield, the number of operations conducted, census population data, and

7  geographical noise contours, along with other data, to create a computer model of the

8  noise expected to be produced by operations involving the EA-18G aircraft.  Wyle Report

9  at 1-2–1-3.

10    According to the 2005 EA, since the noise produced by flight operations is "highly

11  variable[,]" it "is best assessed by time-level sound level metrics such as the Day-Night

12  Average Sound Level (DNL)."  2005 EA at 36.

13       DNL is a composite metric that averages all noise events for a 24-hour
         period, with a 10 dB penalty applied to nighttime events after 10 P.M. and
14       before 7 A.M.  It is an average quantity, mathematically representing the
         continuous A-weighted sound level that would be present if all of the
15       variations in sound level that occur over a 24-hour period were smoothed
         out so as to contain the same total sound energy.  It is a composite metric
16       accounting for the maximum noise levels, the duration of the events (sorties
         or operations), and the number of events that occur over a 24-hour period.
17       DNL does not represent the sound level heard at any particular time, but
         quantifies the total sound energy received.

18
19  *Id.*  While "DNL does not provide specific information on the individual sound

20  events . . . . [D]aily average sound levels are typically used for the evaluation of

21       [2] W YLE LABORATORIES, INC., AIRCRAFT NOISE STUDY FOR NAVAL AIR STATION WHIDBEY ISLAND
22  AND OUTLYING LANDING FIELD COUPEVILLE, WASHINGTON (2004) (filed at Roberts Decl. (docket no.
    44) Ex. 2) [hereinafter "Wyle Report"].

23

ORDER - 6

1    community noise effects, and particularly aircraft noise effects." *Id.* at 37. According to

2    the 2005 EA, the use of DNL to evaluate community noise is supported by a number of

3    "scientific studies and social surveys [that] have found a high correlation between the

4    percentage of groups of people highly annoyed and the level of average noise exposure

5    measured in DNL." *Id.* (internal citations omitted). The Wyle Report also notes that

6    both the American National Standard Institute and the Federal Interagency Committee on

7    Noise have endorsed DNL as the noise level metric for evaluating land use issues and

8    aircraft noise. *See* Wyle Report at 1-2.

9            Compared to the noise produced by the then ongoing EA-6B operations, the Wyle

10   Report projected a decrease in noise at OLF Coupeville following the transition to the

11   EA-18G. *Id.* at 5-1. The Wyle Report considered the effects that this noise would have

12   on the health of the people who live and work in the surrounding areas, including the

13   potential that this noise might result in hearing loss, interference with sleep, and other

14   health issues such as stress, hypertension, and blood pressure. *Id.* at A-19–A-21. This

15   analysis was based on a review of over 100 studies that have considered the impact of

16   noise on a wide range of health issues. *See Id.* A-44–A-52. Based in part on the Wyle

17   Report, the 2005 EA concluded that the transition from the EA-6B Prowler to the EA-

18   18G Growler at NAS Whidbey Island would have no significant impact. 2005 EA at 4.

19   **3.    PLAINTIFF'S ANALYSIS AND DECLARATIONS**

20           After the Navy began transitioning from the EA-6B to the EA-18G, plaintiff began

21   performing its own analysis on the noise and health effects associated with the new

22   aircraft. Plaintiff has submitted much of this analysis in support of its motion. This

23

1   includes the declaration and report of Dr. James Dahlgren, a physician specializing in

2   toxicology, who opined that "[t]he noise from the Navy's Growler aircraft landing and

3   taking off from Outlying Landing Field Coupeville . . . is causing and has caused serious

4   adverse health effects in the residents . . . living near the field." Dahlgren Decl. (docket

5   no. 23) ¶¶ 2, 5.  Karen Bowman, an advanced practice nurse who specializes in

6   occupational and environmental health, has also opined that "[t]he EA-18G jet aircraft

7   noise far exceeds noise regulations set by the state" and the operations at OLF Coupeville

8   have the potential to cause harm to the health of those living around it.  Bowman Decl.

9   (docket no. 24) ¶¶ 2, 4, 12.  Plaintiff has also submitted the declarations of 13 individuals

10  living in the area surrounding OLF Coupeville who claim that the noise from the EA-18G

11  is substantially louder than the EA-6B and that as a result they have suffered, and

12  continue to suffer, negative health effects.[3]

13       Plaintiff also engaged Jerry Lilly and JGL Acoustics, Inc., to perform its own

14  study of the noise produced by the EA-18G FCLP operations at OLF Coupeville.  Lilly

15  Decl. (docket no. 25) ¶¶ 2, 6.  Mr. Lilly took noise measurements at several different

16  locations underneath the flight path for FCLP operations around OLF Coupeville during

17  several hours on May 7, 2013.  Lilly Decl. (docket no. 25) Ex. 2 at 1.  According to Mr.

18  Lilly's report, the noise measurements at some of the test locations reached as high as

19  ───────────────

20      [3] Askins Decl. (docket no. 27); Attwood Decl. (docket no. 28); Kameros Decl. (docket no. 29); J.
    Pickard Decl. (docket no. 30); K. Pickard Decl. (docket no. 31); Portin Decl. (docket no. 32); Rayne Decl.
21  (docket no. 33); Roberts Decl. (docket no. 34); D. Schurr Decl. (docket no. 35); J. Schurr Decl. (docket
    no. 36); B. Wilbur Decl. (docket no. 37); R. Wilbur Decl. (docket no. 38).  Additionally, one of these
22  declarant's doctor has submitted two declarations corroborating these complaints.  *See* Dannhauer Decl.
    (docket no. 26); 2d Dannhauer Decl. (docket no. 39).

23

ORDER - 8

134.2 dB in Un-Weighted Peak intensity.  *Id*. at 2, tbl.1.  Mr. Lilly's report also shows that once converted into DNL with a split of 80% day sessions and 20% night sessions, which the parties agree is closest to the projections in the 2005 EA, the maximum DNL based on his measurements was 79.4 dB.  *Id*. at 5, tbl.4.

## 4.   PROCEDURAL HISTORY

In June 2013, plaintiff sent a letter to the Navy requesting that an EIS be performed regarding the activities at OLF Coupeville.  Stipulation Staying Action and Order Theron (docket no. 10) Ex. 2.  On July 15, 2013, plaintiff filed suit for declaratory judgment and injunctive relief.  Compl. (docket no. 1).  On July 23, 2013, the Navy issued a press release announcing that it would be suspending FCLP training activities at OLF Coupeville for the remainder of 2013.  Stipulation Staying Action and Order Theron (docket no. 10) Ex. 3.  In light of the Navy's voluntary suspension of FCLP at OLF Coupeville, the parties agreed to stay the case in September 2013.  Stipulation Staying Action and Order Theron (docket no. 10).

On September 5, 2013, the Navy issued a Notice of Intent to prepare an EIS regarding the activities at NAS Whidbey Island.[4]  The Notice stated that the purpose of the EIS would be to "evaluate the potential environmental effects associated with the introduction of two additional EA–18G Growler expeditionary squadrons (10 aircraft) and the addition of three EA–18G Growler aircraft to the Fleet Replacement Squadron"

---

[4] Notice of Intent To Prepare an Environmental Impact Statement for EA–18G Growler Airfield Operations at Naval Air Station Whidbey Island, Washington and To Announce Public Scoping Meetings, 78 Fed. Reg. 54635 (Sept. 5, 2013) (filed at Stipulation for Extending Defendants' Time to Answer by Fourteen Days (docket no. 8) Ex. 1).

ORDER - 9

1    at NAS Whidbey Island.  *Id*. at 54635.  On October 10, 2014, the Navy issued a Revised

2    Notice of Intent to Prepare an Environmental Impact Statement, which stated that the

3    upcoming EIS would also consider the affects of adding an additional 13 to 36 aircraft at

4    NAS Whidbey Island.[5]  Finally, on April 9, 2015, the Navy issued another press release

5    stating that the EIS would include an assessment of noise resulting from operations at

6    NAS Whidbey Island and OLF Coupeville, including potential health effects.  Mann

7    Decl. (docket no. 22) Ex. 16.[6]  The Navy expects to release the results of the EIS in 2017.

8    On April 9, 2015, pursuant to the plaintiff's unopposed request, the Court lifted the stay

9    so that plaintiff could file a motion for a preliminary injunction.

10   **DISCUSSION**

11   **1.    LEGAL STANDARD**

12          "[A] preliminary injunction is an extraordinary and drastic remedy, one that

13   should not be granted unless the movant, *by a clear showing,* carries the burden of

14   persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  To obtain a preliminary

15   injunction, plaintiff must "establish that he is likely to succeed on the merits, that he is

16

17          [5] Revised Notice of Intent To Prepare an Environmental Impact Statement for EA–18G Growler
18   Airfield Operations at Naval Air Station Whidbey Island, Washington and To Announce Public Scoping
     Meetings, 79 Fed. Reg. 61296 (Oct. 10, 2014) (filed at Mann Decl. (docket no. 22) Ex. 15).

19          [6] Defendants argue that because the Navy has already announced it is performing an EIS that will
     include an analysis of the FCLP activities at OLF Coupeville, plaintiff's claims are prudentially moot.
20   "Under [the] . . . prudential mootness doctrine[], the central inquiry is [whether] . . . circumstances
     changed since the beginning of litigation that forestall any occasion for meaningful relief."  *S. Utah*
21   *Wilderness Alliance v. Smith*, 110 F.3d 724, 727–28 (10th Cir. 1997).  Plaintiff's claims are not
     prudentially moot because the activities at issue have not only begun, but are ongoing.  As such, despite
     the Navy's announcement that it will conduct the analysis requested by plaintiff, the Court could still
22   grant meaningful relief by issuing an injunction barring the Navy from conducting FCLP operations
     involving the EA-18G aircraft at OLF Coupeville until the proposed EIS has been completed.

23

ORDER - 10

1   likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

2   equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

3   *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Under the Ninth Circuit's sliding

4   scale approach, however, a plaintiff's failure to establish a likelihood of success on the

5   merits is not fatal to its motion.  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

6   1127, 1131 (9th Cir. 2011).  Rather, these factors are balanced and a preliminary

7   injunction could be issued where the plaintiff has raised "serious questions going to the

8   merits," the balance of hardships tips sharply towards the plaintiff, there is a likelihood of

9   irreparable injury and the injunction is in the public interest.  *Id.* at 1135.  While meeting

10  this burden is itself a difficult task, plaintiff bears an even heavier burden in this case

11  because a preliminary injunction would "disturb the status quo."  *See Kikumura v.*

12  *Hurley*, 242 F.3d 950, 955 (9th Cir. 2001).

13  **2.      LIKELIHOOD OF SUCCESS ON THE MERITS**

14          Plaintiff claims that the Navy has failed to satisfy its obligations under the

15  National Environmental Policy Act.  NEPA requires the federal government to conduct

16  an EIS "in every . . . major Federal action[] significantly affecting the quality of the

17  human environment."  42 U.S.C. § 4332(C).  However, an agency is not required to

18  conduct an EIS if it determines that the action under consideration is not a "major federal

19  action."  *See Connor v. Burford*, 848 F.3d 1441, 1446 (9th Cir. 1988) (citing 40 C.F.R. §

20  1508.13).  Where no "major federal action" is identified, an agency may satisfy its NEPA

21  obligations by producing an EA.  *See id.*  An EA is "less formal and less rigorous" than

22  an EIS, *id.*, and must only "briefly provide sufficient evidence and analysis to determine

23

ORDER - 11

whether the agency must prepare an EIS or, in the alternative, issue a finding of no

significant impact[,]" *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th

Cir. 1998).

NEPA is a procedural statute and "it is now well settled that NEPA itself does not

mandate particular results, but simply prescribes the necessary process." *Robertson v.

Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  In considering an agency's

actions under NEPA, a court may not "elevate environmental concerns over other

appropriate considerations." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444

U.S. 223, 227 (1980).  Rather, "once an agency has made a decision subject to NEPA's

procedural requirements, the only role for a court is to insure that the agency has

considered the environmental consequences; it cannot 'interject itself within the area of

discretion of the executive as to the choice of the action to be taken.'"  *Id*. at 227–28

(quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n.21 (1976)).

An agency's determination as stated in an EA is evaluated under the "rule of

reason."  *See Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th

Cir. 1996).  This review is "extremely limited."  *Nat'l Parks & Conservation Ass'n v.

U.S. Dep't of Transp.*, 222 F.3d 677, 680 (9th Cir. 2000).  Under NEPA, a court will look

to "determine whether [the EA] 'contains a reasonably thorough discussion of the

significant aspects of the probable environmental consequences' of a challenged action."

*Id*. (quoting *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987)).  In

doing so, the court must ensure that the agency "took a 'hard look' at the possible

environmental consequences," but "must not, however, substitute [its] own judgment for

that of the agency." *Id.* (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992)).  Accordingly, if the Court "determines that the agency took a 'hard look' at a project's environmental consequences, [its] review is at an end." *Nat'l Parks & Conservation Ass'n*, 222 F.3d at 680.

NEPA applies to both "new and continuing activities." 40 C.F.R. § 1508.18(a). Under NEPA, supplemental analysis is required where "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i)–(ii).  The Navy's regulations interpreting and implementing NEPA similarly provide that:

> The term *continuing activities* which may necessitate the preparation of a NEPA document will be applied by the Department of Navy to include activities which are presently being carried out in fulfillment of the Navy mission and function, including existing training functions, where:
> . . .
> (2) There is a discovery that the environmental effects of an ongoing activity are significantly and qualitatively different or more severe than predicted in a NEPA document prepared in connection with the commencement of the activity.

32 C.F.R. § 775.6(c).

Plaintiff argues that it is likely to succeed on the merits of its claim that the Navy has failed to conduct the required analysis under NEPA.  Plaintiff's complaint sought to require the Navy to "conduct the required environmental review of its flight operations at OLF Coupeville." Compl. (docket no. 1) ¶ 2.  The Navy has now agreed to analyze its flight operations and issue a full EIS.  Plaintiff argues this demonstrates the Navy has conceded it has violated NEPA and establishes a strong likelihood of success on the

ORDER - 13

1    merits.  The fact the Navy has agreed to this study, however, does not amount of a

2    concession that an EIS is statutorily required.  This is because the proposed EIS will

3    consider the potential addition of as many as 36 new aircraft to NAS Whidbey Island.

4        Plaintiff also contends that "new" evidence demonstrates that the Navy's activities

5    are significantly different and more severe than what was previously predicted.

6    Specifically, plaintiff contends the following "new" evidence supports their request for a

7    preliminary injunction:  (1) the Navy has conducted more FCLP operations at OLF

8    Coupeville than was predicted in the 2005 EA; (2) actual noise measurements show that

9    the noise produced by FCLP operations involving the EA-18G is significantly louder than

10   predicted; (3) residents surrounding OLF Coupeville are suffering negative health effects

11   as a result of the operations; and (4) the Navy has changed the manner of its FCLP

12   operations at OLF Coupeville because it rarely uses flight path 14.

13       A.    Number of operations

14       Plaintiff argues that the Navy is obligated to perform additional analysis because

15   it has flown more FCLP operations at OLF Coupeville than was predicted in the 2005

16   EA.[7]  The 2005 EA anticipated that with the introduction of the EA-18G, fewer than

17

18       [7] Plaintiff also argues that the 2005 EA improperly used 2003 as a benchmark for estimating the
     number of operations.  Plaintiff contends that the Navy should have used a five-year average to estimate
19   the number of operations that would be conducted following the transition to the EA-18G aircraft.  This
     argument is time-barred.  Claims brought under the APA, including those regarding compliance with
     NEPA, are subject to a six-year statute of limitations.  28 U.S.C. § 2401(a); *Barnes v. Babbitt*, 329 F.
20   Supp. 2d 1141, 1158–59 (D. Ariz. 2004).  "When a party challenges an agency decision based on NEPA,
     ordinarily the claim accrues when the EIS, the Record of Decision, or a Finding of No Significant Impact
21   ('FONSI') issues."  *Barnes*, 329 F. Supp. 2d at 1158.  Accordingly, the statute of limitations began to run
     when the 2005 EA was issued on January 11, 2005, and expired on January 11, 2011.  Plaintiff, however,
22   did not file its Complaint until July 15, 2013.  Plaintiff's challenges to the adequacy of the 2005 EA are
     barred by the statute of limitations.

23

ORDER - 14

1    6,120 FCLP operations would be conducted at OLF Coupeville each year.  *See* 2005 EA

2    at 10–11.  However, since the EA-18G was fully introduced in 2009, the number of

3    operations at OLF Coupeville has, at times, risen significantly above this number.  For

4    instance, in 2011 and 2012, the Navy flew 9,379 and 9,668, FCLP operations at OLF

5    Coupeville, respectively.  Roberts Decl. (docket no. 44) Ex. A.  During the times relevant

6    to this lawsuit, however, the Navy has stayed close to the projected number of operations.

7    In 2013, it flew 6,927, and in 2014, it flew 6,072.  *Id.*  Because the number of operations

8    conducted at the times relevant to this lawsuit are not significantly different from what

9    was projected in the 2005 EA, this argument fails to raise new information that would

10   support a preliminary injunction.

11        B.    Plaintiff's noise study

12        Plaintiff contends that the EA-18G Growler is both louder than the EA-6B Prowler

13   and generates more noise than projected in the 2005 EA.  In support of this contention,

14   plaintiff has submitted its own noise study.  Plaintiff's study, which was conducted by

15   Jerry Lilly, the owner of JGL Acoustics, Inc., took noise measurements at five locations

16   under the flight path used for FCLP operations.  Lilly Decl. (docket no. 25) Ex. 2 at 1.

17   According to the report submitted by Mr. Lilly, the actual noise measured during some of

18   the FCLP operations reached as high as 134.2 dB.  *Id.* at 2, tbl.1.  Plaintiff contends that

19   this amounts to new information that triggers an obligation for additional analysis under

20   NEPA and supports its request for a preliminary injunction.  Plaintiff is wrong.

21        The *actual* noise measurements taken by Mr. Lilly represents "new" tests but it

22   does not necessarily support plaintiff's request for a preliminary injunction.  Plaintiff's

23

ORDER - 15

expert used a different method to measure noise.  In contrast to DNL (measuring an

average noise quantity over a 24-hour period), Mr. Lilly measured noise at several

locations on one day.  Mr. Lilly's measurements fail to provide support for plaintiff's

case because plaintiff may not challenge the use of DNL simply because some other

metric exists that better suits its purposes.

Courts should not "second-guess" an agency's choice in analytical method simply

because a plaintiff has presented an alternative.  *See City of Bridgeton v. FAA*, 212 F.3d

448, 459 (8th Cir. 2000).  In *City of Bridgeton*, the petitioners challenged the Federal

Aviation Administration's ("FAA") decision to provide federal funds for the expansion

of an airport outside of St. Louis, Missouri, under NEPA on the ground that the FAA had

not adequately considered the noise effects that the expansion would have on the

surrounding communities.  *Id*. at 452.  Just as the plaintiff has done here, the petitioner's

in that case also submitted their own noise study that they contended showed more

significant noise impacts than those predicted by the FAA's analysis.  *Id*. at 459.  Also

like the case here, while the FAA had used an annual average expressed in DNL to

analyze noise, the petitioners in *City of Bridgeton* used a different calculation and argued

that the FAA's EIS was deficient because it did not "consider . . . single-event noise

impacts."  *Id*. at 459–60.

The Eighth Circuit in that case rejected the petitioners' argument.  As the court

properly noted, "[t]he agency, not a reviewing court, 'is entrusted with the responsibility

of considering the various modes of scientific evaluation and theory and choosing the one

appropriate for the given circumstances.'"  *Id*. at 459 (quoting *Sierra Club v. U.S. DOT*,

ORDER - 16

753 F.2d 120, 129 (D.C. Cir. 1985)).  The court further stated that "courts have consistently upheld the [agency's] discretion to choose its cumulative noise impact methodology instead of single-event noise analysis."  *Id.* at 460 (citing *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 578–79 (9th Cir. 1998)).

The Navy also argues against plaintiff's motion on the ground that its own analysis has shown that the EA-18G Growler has a similar noise profile to the EA-6B Prowler, and that in some situations, the Growler is actually a quieter aircraft.  Defs.' Resp. (docket no. 43) at 13 (citing 2005 EA at 42).  The Court finds significant the fact that when Mr. Lilly's measurements are converted into DNL, it is apparent that they are not significantly different or more severe from what was predicted in the 2005 EA.  In terms of DNL with 80% of the flights occurring during the day and 20% occurring at night (which the parties agreed is the closest scenario provided by Mr. Lilly to the estimates in the 2005 EA), Mr. Lilly reports that the FCLP operations at OLF Coupeville produced noise levels ranging from 72.5 dB DNL to 79.4 dB DNL.  Lilly Decl. (docket no. 25) Ex. 2 at 5, tbl.4.  This is similar to what was predicted by the 2005 EA, which estimated that 89% of the affected households would experience DNL between 65 dB and 75 dB, and 11% would experience DNL above 75 dB.  2005 EA at 40, tbl.3-2.  In fact, Mr. Lilly's findings actually support the projection that the EA-18G would be a quieter aircraft than the EA-6B.  While the Wyle Report predicted that 2 households would experience DNL above 80 dB, Wyle Report at 4-11, tbl.4-4, down from 10 households when the EA-6B was in use, *id.* at 3-37, tbl.3-8, Mr. Lilly's report did not find any locations or households with DNL above 80 dB.

ORDER - 17

1      Plaintiff has also submitted declarations from several individuals who live around

2   OLF Coupeville who assert that the EA-18G aircraft is significantly louder than its

3   predecessors, the EA-6B.[8]  These too fail to establish that plaintiff is likely to succeed on

4   the merits.  The subjective opinions of lay persons with a significant interest in the

5   outcome of this litigation are insufficient to overcome the Navy's analysis regarding the

6   relative noise produced by each aircraft.

7      Neither plaintiff's noise study nor its declarations demonstrate the presence of new

8   information that is significantly different or more severe than was predicted in the 2005

9   EA.  Plaintiff's noise study not only fails because its attempt to manufacture "new"

10  evidence by using a different means of measurement is barred, but when converted into

11  DNL, it actually supports the Navy's position.  Plaintiff's declarations similarly fail as

12  they present the Court with only anecdotal accounts of lay persons rather than actual

13  measurements comparing the noise produced by the EA-18G and the EA-6B.

14  Accordingly, plaintiff has not shown a likelihood of success on this ground.

15      C.    Health effects

16      Plaintiff argues that it has presented evidence that the noise from operations at

17  OLF Coupeville following the transition to the EA-18G aircraft has caused, and

18  continues to cause, new health problems to local residents.  Plaintiff has submitted 13

19  declarations from residents who state that they have experienced some type of

---

20

21      [8] Roberts Decl. (docket no. 34) ¶ 4 ("There is no question whatsoever that the Growler noise and
    frequency is substantially louder . . . than the prior Prowler noise[.]"); J. Schurr Decl. (docket no. 36) ¶ 8
22  ("The Growlers are so much louder than the Prowlers . . . ."); *see also* Rayne Decl. (docket no. 35) ¶ 5; R.
    Wilbur Decl. (docket no. 38) ¶ 5.

23

ORDER - 18

degradation in health since the transition to the EA-18G aircraft[9] and four declarations from medical professionals who opine on the relationship between the operations at OLF Coupeville and the health of the local community.[10]  These declarants complain of a number of health issues that they ascribe to jet noise, including anxiety, stress, depression, insomnia, hearing loss, tinnitus, Crohn's Disease, and heart issues.  These declarations, on their face, present serious questions about the current noise level at OLF Coupeville.

Plaintiff's declarations, however, fail to provide sufficiently reliable evidence that demonstrates a likelihood of success on the merits.  The Supreme Court has warned that courts should exercise caution when considering complaints of anxiety and stress related to government action in the context of NEPA challenges.  *See Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 775–79 (1983).  As the Supreme Court explained in *People Against Nuclear Energy*, it is often difficult to detect

> [T]he differences between someone who dislikes a government decision so much that he suffers anxiety and stress, someone who fears the effects of that decision so much that he suffers similar anxiety and stress, and someone who suffers anxiety and stress that "flow directly," from the risks associated with the same decision.

*Id*. at 777–78.  The declaration of Brenda Fritsche Wilbur illustrates this problem.  Ms. Wilbur moved to the area in 2006.  B. Wilbur Decl. (docket no. 37) ¶ 3.  In her

---

[9] Askins Decl. (docket no. 27); Attwood Decl. (docket no. 28); Kameros Decl. (docket no. 29); J. Pickard Decl. (docket no. 30); K Pickard Decl. (docket no. 31); Portin Decl. (docket no. 32); Rayne Decl. (docket no. 33); Roberts Decl. (docket no. 34); D. Schurr Decl. (docket no. 35); J. Schurr Decl. (docket no. 36); B. Wilbur Decl. (docket no. 37); R. Wilbur Decl. (docket no. 38).

[10] Dahlgren Decl. (docket no. 23); Bowman Decl. (docket no. 24); Dannhauer Decl. (docket no. 26); 2d Dannhauer Decl. (docket no. 39).

ORDER - 19

declaration, she asserts that she suffers from anxiety.  *Id.* ¶ 4.  She also states that "I

deeply resent having to wear ear protection," *id.*, and that "I live knowing that when jets

fly two hundred feet above my house, that an accident can occur.  There is no way I can

describe the dread of having to live under these conditions," *id.* ¶ 8.  Ms. Wilbur's

declaration is similar to many other of her neighbors who have described their "constant

dread and anxiety" as a result of living in the flight path.

In addition, because plaintiff has not provided the Court or the Navy with

complete medical records for these declarants, it cannot be said with any degree of

certainty whether their conditions have actually arisen from, or worsened, due to the

introduction of the EA-18G.  In fact, several of the declarations directly undermine this

necessary causal connection.  For instance, Daniel Schurr states that "[t]he Growler noise

causes me severe stress and exacerbates my depression and anxiety problem.  Before I

moved into this noise zone I did not have these conditions at all."   D. Schurr Decl.

(docket no. 35) ¶ 6.  In the very next paragraph, however, Mr. Schurr admits that he was

actually diagnosed with these conditions in 2001.  *Id.* at ¶ 5.  Isobel Kameros, who

moved to the Coupeville area in August 2003, states that with the arrival of the Growlers,

she developed extreme anxiety and depression and she is being treated by her family

doctor, Ann Dannhauer.  Kameros Decl. (docket no. 29) ¶ 7.  Doctor Dannhauer states

that Ms. Kameros complained that these conditions "were worse" in the summer of 2013.

2d Dannhauer Decl. (docket 39) ¶ 3.  However, as the Navy points out, the Navy was not

conducting operations at OLF Coupeville the summer of 2013.  Nortier Decl. (docket no.

47) ¶ 7.  Accordingly, the worsening of Ms. Kameros's conditions in the summer of 2013 must be attributable to something other than the EA-18G activities.

Plaintiff also offers the declarations and reports of two experts.  Dr. James Dahlgren, a physician specializing in toxicology, opines that "[t]he noise from the Navy's Growler aircraft landing and taking off from Outlying Landing Field Coupeville . . . is causing and has caused serious adverse health effects in the residents . . . living near the field."  Dahlgren Decl. (docket no. 23) ¶ 5a.  Dr. Dahlgren draws this opinion based on his review of Mr. Lilly's noise study, scientific literature on the effects of noise on health, and the 13 declarations of residents from around OLF Coupeville.  *Id.* ¶ 3.  Karen Bowman, a nurse, opines that the operations at OLF Coupeville have the potential to cause harm to the health of those living around it.  Bowman Decl. (docket no. 24) ¶ 12.  Ms. Bowman's opinion was similarly based on a review of 40 articles, Mr. Lilly's noise study, and the 13 declarations.  *Id.* ¶ 3.

Both of these expert reports and declarations fail to raise new information.  Dr. Dahlgren and Ms. Bowman base most of their analysis on a review of scientific literature in existence prior to 2005.  Plaintiff claims that this is new information because the Navy failed to consider these studies in 2005.  Plaintiff is mistaken.  The Wyle Report not only reviewed over 100 studies on the relationship between noise and health, but it examined several of the same studies cited by Dr. Dahlgren and Ms. Bowman.[11]  Further, some of

---

[11] *Compare* Wyle Report (docket no. 44-2) at A-19 (discussing Ran Michalak, Hartmut Ising & Ekkehard Rebentisch, *Acute Circulatory Effects of Military Low-Altitude Flight Noise*, 62 INT. ARCH. OCCUP. ENVIRON. HEALTH 365 (1990), *with* Dahlgren Decl. (docket no. 23) Ex. 2 at 4–7 (same).

1   the studies now relied on by plaintiff's experts are not directly relevant or even

2   undermine plaintiff's argument.  For instance, Dr. Dahlgren relies heavily on a report

3   from the World Health Organization that he asserts show that aircraft noise can lead to

4   problems in cardiovascular health.  *See* Dahlgren Decl. (docket no. 23) Ex. 2 at 9, 12.

5   One of these reports, however, concluded that "[w]hile there is evidence that road traffic

6   noise increases the risk of ischaemic heart disease, including myocardial infarction, there

7   is less evidence for such an association with aircraft noise because of a lack of studies."

8   WORLD HEALTH ORGANIZATION, BURDEN OF DISEASE FROM ENVIRONMENTAL NOISE 16

9   (2011).

10          Plaintiff argues that it is irrelevant that the Wyle Report considered the potential

11  health effects associated with the FCLP operations at OLF Coupeville because the 2005

12  EA does not expressly mention these concerns.  However, plaintiff has offered no support

13  for its contention that that the Wyle Report's analysis was insufficient to satisfy the

14  Navy's obligations under NEPA.  Ultimately, the Navy's analysis in 2005 engaged in the

15  "hard look" regarding the potential effects on health that the transition to the EA-18G

16  aircraft might have that is required by NEPA.  Accordingly, plaintiff has not established

17  the existence of any new relevant information that the Navy has failed to consider.

18          D.      Flight paths

19          Plaintiff argues that a preliminary injunction is appropriate because the actual

20  manner in which the Growler operations are conducted is significantly different from

21  what was predicted in the 2005 EA.  Specifically, plaintiff contends that the 2005 EA

22  presumed that FCLP operations at OLF Coupeville would use both of the two available

23

ORDER - 22

1   flight paths, flight path 14 and flight path 32.  Plaintiff notes that since the introduction of

2   the EA-18G aircraft, flight path 32 is now used nearly exclusively.

3          While it is apparent that flight path 14 is now rarely used for FCLP operations,

4   plaintiff has not carried its burden for a preliminary injunction because it has failed to

5   provide any evidence regarding the flight path distribution prior to the introduction of the

6   EA-18G or what was predicted by the 2005 EA.  As plaintiff concedes, the 2005 EA is

7   silent on the distribution of flights between the two flight paths at OLF Coupeville prior

8   to the introduction of the EA-18G or what, if any, changes would be made after the

9   change in aircraft.  At oral argument plaintiff's counsel argued that the Court should

10  "assume" and "infer" that the current exclusive use of flight path 32 is a significant

11  change in circumstances.  Drawing such an inference in plaintiff's favor would be

12  inappropriate at this juncture.  It is the party moving for a preliminary injunction that

13  bears the burden of establishing a likelihood of success on the merits.  This cannot be

14  accomplished merely by asking the Court to draw inferences in its favor rather than

15  demonstrating the existence of meaningful facts supporting its claim.

16  **3.      IRREPARABLE HARM**

17         Plaintiff must show a likelihood that irreparable harm will occur absent an

18  injunction.  *Winter*, 555 U.S. at 22.  A mere possibility of harm is not enough.  *Id.*  Unlike

19  some other areas of the law, courts do not presume harm when suit is brought under

20  environmental statutes.  *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545

21  (1987).

22

23

ORDER - 23

1    Plaintiff relies heavily on the declarations of the residents living near the base to

2  demonstrate irreparable harm.  While these declarations support plaintiff's contention

3  that the Navy's Growler aircraft's operation at OLF Coupeville may be causing some

4  adverse health effects, plaintiff's reliance on them is misplaced as many of these

5  declarants moved to the area surrounding OLF Coupeville after the area had been zoned

6  for high intensity noise or even after EA-18G aircraft began flying there.  Because of the

7  regular activities conducted at OLF Coupeville, the area around the airfield has been

8  locally zoned for noise exceeding 65 decibels since 1992.  *See* Roberts Decl. (docket no.

9  44) Ex. A; Island County, Wash. Code 9.44.  Declarants Gerald Roberts, Isobel Kameros,

10  Maryon Attwood, Brenda Wilbur, and Robert Wilbur, each moved to the area after this

11  zoning occurred.[12]  "Not surprisingly, a party may not satisfy the irreparable harm

12  requirement if the harm complained of is self-inflicted."  *See also* 11A Wright, Kane,

13  Miller & Marcus, *Federal Practice and Procedure* § 2948.1 (2d ed. 2011)**.**

14    Plaintiff's failure to seek a preliminary injunction in a more timely manner also

15  weighs against a finding of irreparable harm.  EA-18G aircraft began flying at NAS

16  Whidbey Island in June 2008.  Plaintiff did not raise its concerns with the Navy until it

17  sent a letter in June 2013, and did not file its Complaint until July 2013.  It then agreed to

18  stay the case in 2013 when the Navy temporarily ceased FCLP exercises at OLF

19  Coupeville.  When the Navy began conducting operations again in January 2014, plaintiff

20  then waited 16 months to file for a preliminary injunction.  Such delay is inconsistent

21

22    [12] *See* Roberts Decl. (docket no. 34) ¶ 4; Kameros Decl. (docket no. 29) ¶ 3; Attwood Decl. (docket no. 28) ¶ 2; B. Wilbur Decl. (docket no. 37) ¶ 3; R. Wilbur Decl. (docket no. 38) ¶ 2.

23

ORDER - 24

1   with the purpose of a preliminary injunction.  As the Ninth Circuit has held, "[a]

2   preliminary injunction is sought upon the theory that there is an urgent need for speedy

3   action to protect the plaintiff's rights.  By sleeping on its rights a plaintiff demonstrates

4   the lack of need for speedy action."  *Lydo Enters. v. City of Las Vegas*, 745 F.2d 1211,

5   1213 (9th Cir. 1984).  This, in turn, indicates a lack of irreparable harm.  *Oakland*

6   *Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

7        For these reasons, plaintiff has not carried the burden of showing that it will suffer

8   irreparable injury absent an injunction.

9   **4.    BALANCE OF EQUITIES**

10       Plaintiff argues that the balance of equities tips in its favor because they have

11  shown that residents around OLF Coupeville are suffering, and will continue to suffer,

12  serious harm while the Navy will only suffer minor inconvenience if forced to stop

13  conducting operations at OLF Coupeville until an EIS is performed.  Plaintiff argues that

14  in 2013 the Navy ceased conducting FCLP exercises at OLF Coupeville for several

15  months and should be required to do so again until the EIS is completed.

16       This argument fails to establish that the balance of equities tip in plaintiff's favor.

17  Ault Field is not the indistinguishable stand-in for OLF Coupeville that plaintiff has

18  portrayed it to be.  The evidence presented by the Navy makes a strong showing that OLF

19  Coupeville offers a unique set of conditions that make it ideal for FCLP operations that

20  closely mirror conditions they will encounter when landing on an aircraft carrier at sea.

21  Shoemaker Decl. (docket no. 48) ¶ 20.  Aircraft flying in the vicinity of Ault Field must

22  maintain an altitude of 1,000 feet.  Aircraft engaging in FCLP, however, typically

23

1   maintain an altitude of 600 feet.  *Id.*  Accordingly, training pilots to land on an aircraft

2   carrier while simultaneously observing the altitude requirement for the airspace around

3   Ault Field would "teach[] and reinforce[] unsafe procedures that must be unlearned when

4   actually landing on an aircraft carrier."  *Id.*  The airspace around OLF Coupeville,

5   however, has no such limitation.  *Id.*  As such, new pilots are typically trained at OLF

6   Coupeville and then continue to practice carrier landings at Ault Field only after they

7   have mastered the procedure under ideal conditions.  Vice Admiral Troy Shoemaker,

8   states that:

> [D]enying electronic attack pilots realistic training available at OLF
> Coupeville would mean asking them to flawlessly execute complex and
> dangerous landings on the deck of a moving aircraft carrier without having
> performed the same procedures in training ashore under circumstances that,
> as closely as possible, replicate landing on an actual aircraft carrier at sea.

12  Shoemaker Decl. (docket no. 48) ¶ 1.

13      Defendants also state that in 2013, when it shifted FCLP operations from OLF

14  Coupeville to Ault Field for several months, it not only experienced delays and air traffic

15  control problems, but it "stressed [the Navy's] capacity to meet training requirements in

16  order to support military readiness[.]"  Nortier Decl. (docket no. 47) ¶ 9.  According to

17  Captain Michael Nortier, Commanding Officer of NAS Whidbey Island, any

18  "[s]ignificant changes such as enjoining FCLPs at OLF Coupeville will result in

19  detrimental effects to airfield operations and military aircrew training[.]"  *Id.* ¶ 17.

20  Similarly, Vice Admiral Shoemaker states that "[a]n order by this Court limiting the

21  Navy's use of OLF Coupeville would cause significant harm to the Navy's ability to

22

23

ORDER - 26

1    produce properly trained, combat-ready forces in a timely and efficient manner."

2    Shoemaker Decl. (docket no. 48) ¶ 1.

3         Plaintiff relies on *Winter v. National Resource Defense Council, Inc.*, in support of

4    its claims.  In *Winter*, the plaintiffs sued seeking an injunction against the Navy from

5    performing military exercises that utilized a new sonar device that plaintiffs claimed

6    would harm marine mammals until the Navy performed an EIS.   The Supreme Court, in

7    holding that no injunction was appropriate, stated that "even if plaintiffs have shown

8    irreparable injury from the Navy's training exercises, any such injury is outweighed by

9    the public interest and the Navy's interest in effective, realistic training" and that "[a]

10   proper consideration of these factors alone requires denial of the requested injunctive

11   relief."  *Id*. at 23.  Similarly, plaintiff here has failed to demonstrate that the balance of

12   interest tips in its favor.

13   **5.    PUBLIC INTEREST**

14        Plaintiff argues that the public interest favors an injunction because it would

15   benefit not only the people living in the areas surrounding OLF Coupeville, but the

16   community and environment as well.  Plaintiff, however, offers no evidence to support its

17   argument that the FCLP operations at OLF Coupeville has any effect on, let alone harms,

18   the public interests of the community or natural environment surrounding the base.  In

19   contrast, defendants argue that the public interest does not favor preventing the Navy

20   from conducting training operations that are important to the nation's security.

21   Defendants also argue that plaintiff's proposed alternative—shifting operations to Ault

22   Field—would result in even more issues.  Specifically, defendants point out that the area

23

ORDER - 27

surrounding Ault Field is even more densely populated than the area around OLF Coupeville.  Accordingly, if the Court were to accept plaintiff's argument that the Navy should simply use Ault Field rather than OLF Coupeville for its FCLP operations, in effect, it would simply be moving the noise to other more densely populated areas.

Even if plaintiff's interests were weighed evenly with the Navy's interest in military preparedness, it is questionable whether plaintiff would prevail.  However, these interests are not weighed evenly.  As the Ninth Circuit has stated, "when a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight."  *F.T.C. v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).  Accordingly, plaintiff has not shown that the public interest weighs in its favor.

## **CONCLUSION**

For the foregoing reasons, plaintiff has not met the burden of showing that it is likely to succeed on the merits, that it will suffer irreparable harm absent an injunction, or that the balance of equities or public interest weigh in its favor.  Nor has plaintiff raised serious questions going to the merits such that an injunction would be warranted under the Ninth Circuit's sliding scale approach.  Accordingly, plaintiff's Motion for Preliminary Injunction, docket no. 21, is DENIED.

1      IT IS SO ORDERED.

2      Dated this 11th day of August, 2015.

3

4                                          _____

5                                          THOMAS S. ZILLY
                                           United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23